UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

T.L., a student with a disability, by her parents
A.L. and R.L.

                    Plaintiffs,

        – against –

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                    Defendant.

**MEMORANDUM AND ORDER OF
REMAND**

12-CV-4483



**Appearances:**

For the Plaintiff:

       **George P. Zelma**
       **Law Offices of George Zelma and David Berlin**
       **28 West 44th Street, Suite 711**
       **New York, NY 10036**

For the Defendant:

       **Michael A. Cardozo**
       **Charles E. Carey, Jr.**
       **New York City Law Department**
       **100 Church Street**
       **New York, NY 10007**

JACK B. WEINSTEIN, Senior United States District Judge:

Table of Contents

I.    Introduction ........................................................................................................ 2
II.   Facts and Procedural History ............................................................................ 3
      A.   T.L.'s Background and Education.............................................................. 3
      B.   May 2011 IEP Meeting and Placement Offer .......................................... 5
      C.   IHO Proceedings ...................................................................................... 7
      D.   SRO Proceedings .................................................................................... 11
      E.   Federal Court Proceedings ..................................................................... 14
            1.   Generally ........................................................................................ 14
            2.   View by the Court........................................................................... 14
III.  Law .................................................................................................................. 15
      A.   Summary Judgment Standard and Standard of Review in IDEA Context.......... 15
      B.   Individuals with Disabilities Education Act and Relevant State Law ............... 16
            1.   Individualized Education Program Requirement ............................ 16
            2.   State Administrative Review of IEP Offered ................................. 18
            3.   Judicial Review of IEP Offered...................................................... 19
IV.   Application of Law to Facts: The PICA Problem............................................. 23
V.    Power to Remand ............................................................................................. 28
VI.   Conclusion ....................................................................................................... 29
      Appendix A: Glossary...............................................................................
      Appendix B: Notes on View by Court ......................................................

## I.    Introduction

A.L. and R.L. sue the New York City Department of Education on behalf of their

daughter, T.L., who has serious learning disabilities.  They contend that the defendant failed to

offer her a free appropriate public education, as it was required to do by the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*

They seek reversal of the decision of a state review officer ("SRO"), who found that the

defendant had offered T.L. an appropriate public school education.  On review, the SRO

overruled an order of the impartial hearing officer ("IHO"), *see id.* §§ 1415(f), (g), who had

granted to the parents prospective payment and reimbursement by the defendant for T.L.'s

tuition and related educational services at the Rebecca School for the 2011-2012 school year.

*See* Application of the New York City Department of Education, No. 12-051, June 8, 2012

2

("SRO Opinion"), Feb. 20, 2013, ECF No. 26-2, *reversing*, IHO Corrected Findings of Fact and Decision, Mar. 20, 2012 ("IHO Opinion"), Feb. 20, 2013, ECF No. 26-5.

Both parties move for summary judgment. Their motions are denied. The case is remanded to the SRO for further development of the administrative record and, if necessary, additional factfinding.

Attached as Appendix A is a glossary of the acronyms used in this opinion and in documents pertinent to the case. Appendix B contains the court's notes from its site visit to the public and private schools involved in the litigation. *See infra* Part II.E(2). (describing purpose and nature of visit).

## II.    Facts and Procedural History

### A. T.L.'s Background and Education

T.L., now eighteen years old, was diagnosed with Autism Spectrum Disorder at the age of three and moderate/profound mental disabilities. *See* Pl's. Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1 Stmt.") ¶¶ 1, 38, Dec. 21, 21012, ECF No. 13; Pl's. Mem. of Law in Supp. ("Pl. Mem."), at 2, Dec. 24, 2012, ECF No. 14.

Her developmental disabilities are profound. *See* Pl. Mem. at 3. T.L. exhibits major delays in speech, language and cognitive function development; she has difficulty understanding directions. Pl. 56.1 Stmt. ¶¶ 4, 39. Her academic skills are at the pre-kindergarten level. SRO Opinion at 8. She lacks the ability to process sensory information. Pl. Mem. at 3. Her interpersonal abilities are sharply limited, and she maintains little eye contact. *Id.* She exhibits a high degree of impulsivity. *See* SRO Opinion at 10. She is in constant motion, wandering the halls of the school to which she is assigned. *See id.*

T.L. suffers from severe PICA, a neurological disorder that causes her to frequently grab inedible objects and place them in her mouth. *See* Pl. Mem. at 3; IHO Opinion at 16. *See infra* Part IV (describing in more detail clinical symptoms of PICA as well as T.L.'s specific condition). This is her way of exploring her surroundings and soothing herself. *See* SRO Opinion at 10; IHO Opinion at 3. Because of her PICA and other conditions, T.L. requires constant adult supervision to ensure that she does not unintentionally harm herself. *See id.*

After pre-school, T.L. attended New York City Public School ("PS") 177 from September 1999 through June 2010. Pl. 56.1 Stmt. ¶ 6. For these eleven years she was placed in a 6:1:1 program, a classroom ratio of six students to one teacher and one paraprofessional. *See id.* ¶ 32. It is conceded that by 2009 T.L. was not progressing in this placement. *Id.* The defendant's performance report in November 2009 stated:

> T.L. is a rather enigmatic student. Since the beginning of the year T.L. has not completed any assignments- functional or academic. T's attention and primary focus has been oral. T.L. enjoys putting things in her mouth. T.L. cannot hope to meet her academic of functional potential in the classroom until her behavior P.I.C.A. needs are extinguished. *See* Department of Education 2009-2010 Report to Families ("T.L. Performance Report from P.S. 177"), IHO Parents' Exhibit I, at 5, Feb. 20, 2013, ECF No. 27. *See also* Pl. 56.1 Stmt. ¶ 32.

On November 19, 2009, the Committee on Special Education ("CSE") convened to design T.L's Individualized Education Program ("IEP") for the remainder of the school year. *See* Pl. 56.1 Stmt. ¶ 33. The IEP concluded that T.L.'s 6:1:1 placement at PS 177 was not meeting her educational and emotional needs. *Id.* ¶¶ 33-35, 41-43. The CSE deferred the matter to the Department of Education Central Based Support Team ("CBST"), recommending T.L.'s twelve-month placement at a non-public special education school from December 2009 through December 2010. *See id.* ¶¶ 36, 41, 43. Nevertheless, T.L. remained at PS 177 through the 2009-2010 academic year. *Id.* ¶ 44.

In September 2009, her parents unilaterally enrolled her in the Rebecca School, where she remains. *See id.* ¶ 45; SRO Opinion at 2. The Rebecca School is a private day school for children, ages four through twenty-one, with special needs and neurodevelopmental disorders, including autism. Pl. Mem. at 5. By stipulation between the parties, the defendant reimbursed the parents for T.L.'s tuition at this school for the 2010-2011 academic year. *See generally* Amended Interim Order on Pendency, Dec. 5, 2011 ("Amended Interim Order on Pendency"), at 4-5, *affirming* Nov. 8, 2011 Interim Order on Pendency, Feb. 20, 2013, ECF No. 26-5.

### B. May 2011 IEP Meeting and Placement Offer

On May 24, 2011, a meeting was held by the CSE team to develop an IEP for TL for the 2011-2012 school year. *See* Def's. Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("Def. 56.1 Stmt.") ¶¶ 8, Jan. 11, 2013, ECF No. 16. The team participants included T.L.'s parents, their educational advocate, a district special education teacher, the district school psychologist, a social worker from the Rebecca School, and a special education teacher from the Rebecca School. *See id.* ¶ 9; SRO Opinion at 8. T.L.'s parents and her teachers from the Rebecca School for the 2010-2011 school year participated in this meeting and provided input for the IEP. Def. 56.1 Stmt.¶¶ 10-11; Pl. Mem. at 6.

Considered by all participants in developing the IEP was T.L.'s autism and her behavioral needs. *See* Def. 56.1 Stmt. ¶ 11-12. This included the difficulties she experienced in processing sensory information, her high levels of impulsivity, her need for constant movement, and the way in which her behavior interfered with her ability to receive instruction. *See* Pl. Mem. at 6; Pl. 56.1 Stmt. ¶¶ 53-55.

In light of T.L.'s severe PICA issues, the CSE team recommended a classroom environment that would not stimulate her tendency to consume non-food items—a classroom

that was "clean and clear and [did] not have a lot of objects she can put in her mouth." *See* Pl. Mem. at 6 (quoting May 24, 2011 IEP, IHO Parents' Exhibit D, Feb. 20, 2013, ECF No. 27).

The team also considered a December 2010 classroom observation of T.L. at the Rebecca School, which was performed by the district school psychologist, a December 2010 progress report from the Rebecca School, and T.L.'s previous IEP from November 2009. Def. 56.1 Stmt.¶ 10. In developing the IEP for the 2011-2012 year, the participants relied upon T.L.'s academic and service needs as developed by the Rebecca School in its progress reports for the student. *See id.* ¶ 18; Pl. Mem. at 6. They explored different classroom ratios and the possibility of deferring the recommendation to the CBST for the student's private school placement. *See* Pl. 56.1 Stmt. ¶ 58; Pl. Mem. at 8.

Drafted by the CSE was T.L.'s IEP for the period from July 1, 2011 through June 30, 2012. *See* Pl. 56.1 Stmt. ¶ 48. After the committee's consideration of different options, the IEP recommended a twelve-month placement for the child in a special class at a specialized public school. *See* Def. 56.1 Stmt. ¶ 13; Pl. Mem. at 8. The recommendation was for a 6:1:1 class, consisting of six students, one teacher, and one paraprofessional. *See* Pl. 56.1 Stmt. ¶ 49; May 24, 2011 IEP, IHO Parents' Exhibit D, at 1. Related services were to be provided. *See* Def. 56.1 Stmt. ¶ 13. They included a 1:1 crisis management paraprofessional; three weekly sessions of 1:1 occupational therapy; one weekly session of group occupational therapy; three weekly sessions of 1:1 speech-language therapy; two weekly sessions of 1:1 physical therapy; adapted physical education; and a special transportation paraprofessional. *See* SRO Opinion at 9-10; Pl. Pl. 56.1 Stmt. ¶ 49; Def. Mem. of Law in Supp. ("Def. Mem."), at 12, January 11, 2013, ECF No. 18.  With the input of all participants at the CSE team meeting, a Behavior Intervention Plan ("BIP") was also developed . *See* Def. 56.1 Stmt. ¶ 16. It established strategies to address

T.L.'s PICA disorder and other behavioral needs. *See id.* None of the parties challenge this BIP and its recommendations. *Id.* ¶ 17.

In a Final Notice of Recommendation received by the parents in June 2011, the defendant offered the student a 6:1:1 classroom placement at P721Q, the John F. Kennedy School ("PS 721" or "Kennedy School"). *See id.* ¶ 21. The Kennedy School is a specialized public high school for children with autism and other special needs who range in age from fourteen to twenty-one years. *See id.* ¶ 22. It has 350 students. *Id.* On June 21, 2011, both parents visited the Kennedy School but were unable to view T.L.'s proposed classroom with students in attendance. *See* IHO Parents' Exhibit G, Feb. 20, 2013, ECF No. 27. On June 24, 2011, the parents notified the defendant in writing that they felt the recommended placement at the Kennedy School was inappropriate; they intended to re-enroll T.L. in the Rebecca School for the 2011-2012 academic year; and they intended to seek from the defendant tuition and transportation reimbursement, as well as direct payment for the services of the crisis and transportation paraprofessionals. *See id.* at 2; Pl. Mem. at 8.

### C. IHO Proceedings

On July 1, 2011, the parents filed an administrative complaint requesting a hearing pursuant to IDEA, 20 U.S.C. §§ 1415 (f) and 1412 (a)(10)(C). *See* IHO Corrected Findings of Fact and Decision, Mar. 6, 2012 ("IHO Opinion"), at 2, Feb. 20, 2013, ECF No. 26-5. They sought reimbursement for tuition, including costs for related educational services, for T.L.'s placement at the Rebecca School from July, 1, 2011 through June 30, 2012. *Id.* at 2. An IHO was designated. For the pendency of the ongoing proceedings, the IHO ordered the defendant to provide the funding for T.L.'s continued placement at the Rebecca School pursuant to 20 U.S.C. § 1415 (j). *See generally* Interim Order on Pendency, Nov. 8, 2011, *amended and affirmed* Dec.

5, 2011, Feb. 20, 2013, ECF No. 26-5.  On appeal, the SRO reversed the IHO's determination

that the Rebecca School was T.L.'s pendency placement.  *See* SRO Opinion at 3-4; Pl. 56.1 Stmt.

¶ 63-64.

An impartial three-day hearing was conducted by the IHO between October and

December 2011.  *See id.*  The decision was issued on February 3, 2012.  *See* Def. 56.1 Stmt. ¶

54.  A corrected opinion was issued on March 6, 2012.  *See generally* IHO Opinion, ECF No.

26-5.  The IHO concluded that the defendant had failed to offer T.L. a free appropriate public

education.  *See* IHO Opinion at 17.  It found that:

1. T.L.'s parents, the Rebecca School staff, and the parents' educational advocate had

   participated in the May 24, 2011 CSE meeting to design the IEP for the 2011-2012

   school year.  *See id.* at 14.  Their information and input had been used by the

   defendants as the basis for the IEP.  *See id.*

2. There was little merit to plaintiff's argument that a 6:1:1 program would be

   categorically inadequate for T.L. because it was previously unsuccessful in the 2009-

   2010 school year.  *See id.* ("Each school year and students and programs are

   different.").

3. The defendant's recommended classroom placement in the Kennedy School did not

   provide T.L. with an appropriate educational environment.  This was because:

   a. Since the defendant had not educated T.L. after June 2010, it should have

      evaluated the student through additional skills testing before determining her

      placement.  *Id.*

   b. The classroom observation that was performed by the defendant in developing the

      IEP was inadequate.  *See id.*

8

c. The IEP failed to state the student's need for "a quiet room that is bare for sensory breaks" or for "instruct[ion] in this 1:1 setting." *Id.* at 15. A quiet room is a space for a student like T.L. to relax, focus, and reduce her anxiety during the school day. *See e.g.*, IHO Hr'g. Tr. 320:14-321:3, Feb. 20, 2013, ECF No. 27. *See infra* Appendix B (describing a quiet room at both schools).

d. Contrary to defendant's assertions, allowing the student to walk the Kennedy School hallways "would not offer her that calm, soothing, lack of sensory input that she needs from time to time to regulate herself." *See id.* It would in fact increase her anxiety. *Id.*

e. The defendant's recommended program at the Kennedy School did not have a "sensory gym" during the summer of 2011 nor was one available by September of that year. *Id.* A sensory gym is a facility with proprioceptive equipment and other materials for students to work on their sensory systems. *See e.g.*, IHO Hr'g. Tr. 238:5-19. The equipment emphasizes a student's physical perception, balance and relationship to her surroundings. *See infra* Appendix B (describing sensory gym at both schools).

f. "The [Kennedy School] building and classroom are typical [public school] classrooms with various shelves, smart boards, desks and chairs that students are expected to sit at. There is a large cafeteria with many exits and the building has wide hallways with paper hanging on either side of the walls." *Id.*

g. Although the defendant's IEP provided more related educational services than the Rebecca School, T.L. "would not be regulated enough to attend to any of these sessions and be open to learning" at the Kennedy School. *See id.* at 15-16.

9

    h.  Defendant's IEP failed to elaborate on the nature and degree of T.L.'s PICA

disorder and her waxing and waning sensory needs. *Id.* at 17.  The defendant's

recommended placement would not provide T.L. with an opportunity to withdraw

from sensory input when she wanted to do so. *See id.* at 16.  As a result, "the

actual recommended program at JFK [Kennedy School] did not provide a floor of

opportunity for T.L. to learn."

The IHO found that the unilateral placement by the parents at the Rebecca School, when

it provided a 1:1 paraprofessional in September 2011, was appropriate. *Id.* at 18-19 (also finding

that the Rebecca School program was not appropriate during the summer of 2011because the

school did not have a 1:1 paraprofessional at the time). *Id.* at 18.  According to the IHO, the

Rebecca paraprofessional helped appropriately address T.L.'s PICA and other complex sensory

needs. *See id.*  The IHO concluded that T.L. was progressing at the Rebecca School and that it

was addressing her unique needs. *Id.* at 19.

The IHO also determined that equitable considerations supported the parents' claim for

reimbursement.  It found that T.L.'s mother cooperated with the defendant by attending the CSE

meetings, timely visiting the Kennedy School, and advising the defendant of her concerns. *See*

*id.* at 19.  She testified that although she was not satisfied with the recommended 6:1:1

placement for her daughter, she would have considered other recommendations within the public

school system. *See id.* at 19-20.

The IHO found that the parents were entitled to prospective payment and reimbursement

by the defendant for tuition, including related educational services, associated with T.L.'s

unilateral placement at the Rebecca School from September 11, 2011 through June 30, 2012.

*See* IHO Opinion at 21; Def. 56.1 Stmt. ¶ 57.

**D.  SRO Proceedings**

The Department appealed.  By decision dated June 8, 2012, the SRO reversed.  *See generally* SRO Opinion, Feb. 20, 2013, ECF No. 26-2.  It was determined that:

1.  With respect to the IHO's findings regarding deficiencies in the development and substance of the May 2011 IEP,

    a.  The IHO should not have addressed these issues because the adequacy of the IEP was not challenged in the parents' due process complaint.  *See id.* at 7-8.  The IHO's findings on these claims must be reversed, and appellate review is confined only to the *implementation* of the IEP at the Kennedy School.  *See id.* at 8 (emphasis added);

    b.  Even if the parents had contested the substance of the May 2011 IEP in their due process complaint, the evidence demonstrates that the IEP addressed T.L.'s sensory, academic, social, and emotional needs.  *Id.* at 8-9;

    c.  The IEP addressed T.L.'s needs pertaining to sensory regulation and social and emotional functioning through the incorporation of different techniques, verbal instruction, sensory breaks, and various other protocols.  *See id.* at 9;

    d.  The CSE addressed the student's impulsivity and PICA by drafting a behavioral intervention plan (BIP).  To discourage the student from placing inedible objects into her mouth, the BIP recommended that the classroom environment be organized, clean, clear, and not overstimulating.  *See id.* at 10; and

    e.  In light of the sensory and professional support incorporated in the May 2011 IEP, the program recommended by the defendant "was reasonably calculated to provide the student with educational benefits, and therefore, offered her a [free

appropriate public education] during the 2011-12 school year." SRO Opinion at
10-11.

2.  With respect to the student's recommended assignment to the Kennedy School,

    a.  The parent's concerns about the placement were speculative because the parents
rejected the CSE's recommendations and enrolled their daughter in a private
school of their choice. *See id.* at 12;

    b.  Even assuming the student had attended the assigned school, "the parents'
concerns regarding the implementation of the IEP are not adequately supported by
the evidence." *Id.*;

    c.  According to the SRO, the public school was not too large or overstimulating.
*See id.* It provided a supportive and structured environment and was capable of
implementing the student's IEP. *Id.* The Kennedy School staff monitored
students, assessed their individual needs, and adjusted the classroom environment
and routines accordingly so as to avoid their overstimulation. *See id.* at 13.
Adequate adult support and supervision were also provided during lunch in the
cafeteria. *See id.*;

    d.  The school "had the resources to address the student's sensory needs." *Id.* at 15.
It had a sensory gym. *Id.* at 14. It also utilized sensory breaks, various protocol,
and "adapted physical education" to assist students. *Id.*;

3.  With respect to the Kennedy School's ability to address T.L.'s PICA disorder,

    a.  "[T]he hearing record illustrates how the public school site...could address her
pica-related behavior and maintain her safety." *Id.* at 14;

b. In addition to defendant's recommendations in the IEP and BIP, the student's PICA-related needs were addressed through the Kennedy School's provision of a 1:1 crisis management paraprofessional and behavior support staff, including a psychologist and related services providers. *See id.* at 13-14.

c. "[T]he special education teacher also organized her classroom in such a fashion so that there was nothing around the students and nothing hanging from the ceiling." *Id.* at 14.

d. The school was "very cautious" about which items were present in the classroom and those that were locked away. *Id.* Teachers and staff communicated with each other about any students with PICA concerns to ensure that the school was aware of and responsive to the student's needs. *See id.*

e. The assistant principal, who had experience working with students suffering from PICA, could collaborate with teachers to develop a classroom environment and plan for instruction that addressed those concerns. *Id.*

According to the SRO, there was "no basis to conclude that if the student had been enrolled in the public school and the district been required to implement her IEP, that the district would have thereafter failed to implement the May 2011 IEP in a material or substantial way...." *Id.* at 15.

Since it was determined that the defendant had offered T.L. a free appropriate public education for 2011-2012, the SRO did not consider whether the parents' unilateral placement was appropriate or whether equitable considerations favored the parents. *See id.* It reversed the IHO's award of tuition costs at public expense for the Rebecca School during this school year. *Id.*

### E.  Federal Court Proceedings

#### 1.  Generally

In September 2012, M.W.'s parents timely commenced an action in this court, seeking reversal of the SRO Opinion.  *See* Compl., Sept. 7, 2012, ECF No. 1; 20 U.S.C § 1415(i)(2)(A), (B); N.Y. Educ. Law § 4404(3)(a).  In December 2012, they filed a motion for summary judgment; the Department filed its own summary judgment motion the following month.

Argument on the summary judgment motions was heard on March 18, 2013.

#### 2.  View by the Court

Prior to the argument on the merits, the court conducted a site visit with counsel for both parties and both parents to the Rebecca and Kennedy Schools.  Both schools were visited with the consent of the parties.  *See* Hr'g. Tr. ("Tr.") 2, Mar. 18, 2013.  By agreement, no reporter was present.  Testimony was not taken.

In a case such as the present one, the court would normally rely exclusively on the written state record in making a decision on the merits.  In the instant proceeding, it found it "difficult to visualize the physical surroundings described in the record and the parties' briefs." *See* Visitation Order, Feb. 28, 2013, ECF No. 28 ("[T]he court will visit a classroom and other relevant facilities such as would be used, were T.L. to be taught there, in both the facility that would have been provided by the New York City Department of Education and that provided by the private Rebecca School.").  The visit was conducted for the purpose of assisting the court in understanding the nature of the facilities described in the state proceedings and the terminology used, such as the dangers of materials readily available in the school related to "pica by mouthing/eating inedible items," "crisis management paraprofessional," a "quiet, small bare room to address sensory needs," and "sensory gymnasium."  *See, e.g.*, IHO Opinion, at 13-18;

14

SRO Opinion, at 8-15.  The visit proved useful for these purposes.  *See infra* Appendix B

("Notes of Court from Site Visit, March 18, 2013").  *See also* Tr. 10-11.

**III.    Law**

   **A.  Summary Judgment Standard and Standard of Review in IDEA Context**

   Summary judgment in the IDEA "context involves more than looking into disputed issues

of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions."

*T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per

curiam) (internal quotation marks omitted).  A district court must base its decision on the

preponderance of the evidence and give due weight to the outcome of the state administrative

proceedings.  *Id.* (citing 20 U.S.C. § 1415(i)(2)(C)(iii)); *see, e.g., Cerra v. Pawling Cent. Sch.

Dist.*, 427 F.3d 186, 191 (2d Cir. 2005) (describing the "substantial deference" federal courts

owe "to state administrative bodies on matters of educational policy").  Deference to the result of

the state administrative proceedings "is particularly warranted when the district court's decision

is based solely on the administrative record." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d

105, 113 (2d Cir. 2007).

   If there is a conflict between the original and appellate administrative rulings, deference

is ordinarily due to the state appellate decision.  "If a final state determination conflicts with an

earlier decision, the earlier decision may be afforded diminished weight."  *Id.* at 113 n.2; *see also*

*Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984)

(noting that federal courts must "defer to the final decision of the state authorities," even if "the

reviewing authority disagrees with the hearing officer").  Deference to an SRO decision depends

on the quality and substance of the appellate opinion.  *See  R.E. v. N.Y.C. Dep't of Educ.*, 694

F.3d 167, 189 (2d Cir. 2012).  Federal courts reviewing the decision "must look to the factors

that 'normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id.* (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)). "Therefore, a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *Id.*

While the parties may label a dispositive motion filed in an IDEA action one for summary judgment, it is in substance an appeal from a state administrative determination. *See Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005). The court is not ruling in a typical summary judgment setting. It must determine whether the administrative record and any additional evidence produced demonstrate compliance with the IDEA. *See Wall ex rel. Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F. Supp. 501, 508 (E.D.N.Y. 1996).

## B. Individuals with Disabilities Education Act and Relevant State Law

### 1. Individualized Education Program Requirement

"The IDEA is the most recent Congressional enactment in an ambitious federal effort to promote the education of handicapped children." *Gagliardo*, 489 F.3d at 107 (internal quotation marks omitted). Enacted to effectuate a variety of goals, the statute is intended, *inter alia*, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for future education, employment, and independent living," and "to

ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B).

"Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'" *Gagliardo*, 489 F.3d at 107 (quoting 20 U.S.C. § 1412(a)(1)(A)). "To meet these requirements, a school district's program must provide special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks omitted).

Services must be administered according to an IEP, which must be reviewed—and revised, if necessary—at least once each year. *See* 20 U.S.C. § 1414(d)(4).

The IEP is the "centerpiece of the IDEA's educational delivery system." *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507 (2d Cir. 2006) (internal quotation marks omitted). It is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *Id.* at 507-08 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

Parents who are dissatisfied with the IEP and placement offered are permitted to unilaterally place their child in a private school and then seek the reimbursement of tuition and other expenses from the relevant local educational agency. *See* 20 U.S.C. § 1412(a)(10)(C). They do so, however, at their own financial risk. *See, e.g., A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).

## 2.   State Administrative Review of IEP Offered

Pursuant to the IDEA, parents "are specifically entitled to request a due process hearing in order to present complaints as 'to any matter relating to the identification, evaluation, or educational placement of the[ir] child, or the provision of a free appropriate public education.'" *Cave v. East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) (quoting 20 U.S.C. § 1415(b)(6)(A)).

"New York has opted for a two-tier administrative system for review of IEPs.  First, an impartial hearing officer is selected from a list of certified officers and appointed by the local board of education or the competent state agency to conduct the initial hearing and issue a written decision.  That decision can then be appealed to [an SRO] of the New York Education Department." *Id.*; *see also* N.Y. Educ. Law § 4404(1)-(2).  "Only after exhaustion of these procedures has an aggrieved party the right to file a suit in a federal or state court. . . .  Failure to exhaust the administrative remedies deprives the court of subject matter jurisdiction." *Cave*, 514 F.3d at 245; *see also* 20 U.S.C. § 1415(i)(2).

The IDEA provides that an SRO's review of an IHO decision is *de novo*; the "officer conducting such review shall make an *independent decision* upon completion of such review." 20 U.S.C. § 1415(g)(2) (emphasis added).  *See M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 869 F.Supp.2d 320, 330 (E.D.N.Y. 2012) ("[T]he SRO's review of the IHO's determinations is essentially *de novo*.").  The relevant New York statute, echoing in substance the standard of review set forth in the IDEA, provides that an SRO reviewing the decision of an IHO "shall review and may modify, in such cases and *to the extent that the review officer deems necessary, . . . any determination of the impartial hearing officer* relating to the determination of the nature of a child's handicapping condition, selection of an appropriate special education program or

service and the failure to provide such program[,] and require such board to comply with the provisions of such modification." N.Y. Educ. Law § 4404(2) (emphasis added).

This system of review—*i.e.*, the provision of an appellate-level administrative adjudicator possessing the power to modify or set aside the orders of the initial hearing officer without deferring to them—is consistent with general principles of federal administrative law. *See, e.g.*, Richard E. Levy & Robert L. Glicksman, *Agency-Specific Precedents*, 89 Tex. L. Rev. 499, 548 (2011) (noting that in "many agency adjudications, an initial hearing is conducted by an [administrative law judge] or other hearing officer even though the agency itself retains de novo decisional authority").

In analyzing a two-tiered administrative review process similar to that of New York, the Court of Appeals for the Third Circuit summarized the state review process:

> We . . . hold that appeals panels reviewing the . . . findings of hearing officers in two-tier schemes . . . exercise plenary review, except that they should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion.

*Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995) (Becker, J.). This conclusion is consistent with the relevant provision of the IDEA, discussed briefly above. *See* 20 U.S.C. § 1415(g)(2).

### 3. Judicial Review of IEP Offered

As noted above in Part III.A, *supra*, in the IDEA context, substantial deference is given by federal courts to the final state administrative determination. *See, e.g.*, *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-08 (1982). This is at least in part due to the fact that federal judges generally "lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* at 208 (internal quotation marks omitted).

When, as in the present case, the IHO and SRO disagree, "the general rule is that 'courts must defer to the reasoned conclusions of the SRO as the final state administrative determination.'" *R.E.*, 694 F.3d at 189. That assumes, however, that the SRO opinion is adequately reasoned, thoroughly considers all the relevant issues raised by the case, and has sufficient evidentiary support. *See id.* at 189; *M.H.*, 685 F.3d at 246-55. As noted by the Court of Appeals for the Second Circuit:

> "[W]hen…the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment." *R.E.*, 694 F.3d at 189 (quoting *M.H.*, 685 F.3d at 246).

Nonetheless, the federal judiciary does have an important role in reviewing state administrative determinations to ensure enforcement of IDEA. *See generally* 20 U.S.C. § 1415(i). Compliance with the IDEA is established—that is, a free appropriate public education is offered—if (1) the procedural requirements set forth in the statute are complied with, and (2) the student's IEP is reasonably calculated to enable the child to receive educational benefits. *See, e.g.*, *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192-95 (2d Cir. 2005).

Parents challenging a proposed IEP bear the burden of persuasion as to both the inappropriateness of the IEP offered and the appropriateness of private services obtained. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam). To determine whether parents are entitled to reimbursement pursuant to the IDEA, courts engage in a multistep review process. *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).

20

First, courts "examine whether the state has complied with the procedures set forth in the IDEA." *Id.* This inquiry is "no mere formality," since "adequate compliance with the procedures prescribed w[ill] in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (internal quotation marks omitted). "However, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *A.C.*, 553 F.3d at 172 (internal quotation marks and bracketing omitted). Procedural errors will not render an IEP inadequate in cases in which the child's educational opportunities were not affected and if the parents were not deprived of the chance to participate meaningfully in the development of the IEP. *See* 20 U.S.C. § 1415(f)(3)(E)(ii); *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192-94 (2d Cir. 2005); *cf. J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 69-70 (2d Cir. 2000). Procedures required by the IDEA in the development of IEPs include:

> An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to [the] child, and to obtain an independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1); *see also Cerra*, 427 F.3d at 192.

Since the IDEA "incorporates some but not all state law concerning special education," *Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 734 (2d Cir. 2007), courts are to consider in their procedural analysis whether the development of the IEP and the resulting program complied with state law. *See A.C.*, 553 F.3d at 172 & n.1.

Second, after reviewing a school district's actions for procedural compliance, courts "consider whether the IEP developed through the [IDEA's] procedures is reasonably calculated to enable the child to receive educational benefits." *Cerra*, 427 F.3d at 192 (internal quotation

21

marks and bracketing in original omitted).  A school district offers a free appropriate public

education "by providing personalized instruction with sufficient support services to permit the

child to benefit educationally from that instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 203

(1982).  "A school district is not, however, required to furnish every special service necessary to

maximize each handicapped child's potential." *Cerra*, 427 F.3d at 195 (internal quotation marks

omitted).  "Rather, a school district fulfills its substantive obligations under the IDEA if it

provides an IEP that is likely to produce progress, not regression, and if the IEP affords the

student an opportunity greater than mere trivial advancement." *Id.* (internal quotation marks

omitted).  In determining substantive adequacy, courts must weigh heavily the statute's

requirement that the education of disabled children take place in a minimally restrictive

environment; "there is a strong preference for children with disabilities to be educated, to the

maximum extent appropriate, together with their non-disabled peers." *A.C.*, 553 F.3d at 173

(internal quotation marks omitted); *see* 20 U.S.C. § 1412(a)(5).

A "district court must examine the record for any objective evidence indicating whether

the child is likely to make progress or regress under the proposed plan.  Because administrative

agencies have special expertise in making judgments concerning student progress, deference is

particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195

(internal quotation marks and citation omitted).

If it is determined that the IEP offered was procedurally and substantively adequate, "the

State has complied with the obligations imposed by Congress and the courts can require no

more." *Id.* at 192 (internal quotation marks omitted).  If, however, the IEP is procedurally or

substantively deficient, the court must determine "whether the private schooling obtained by the

parents is appropriate to the child's needs." *Id.* "Parents seeking reimbursement for a private

placement bear the burden of demonstrating that the private placement is appropriate, even if the proposal in the IEP is inappropriate. Nonetheless, parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006) (citation omitted). Thus,

> [a]n appropriate private placement need not meet state education standards or requirements. For example, a private placement need not provide certified special education teachers or an IEP for the disabled student. In addition, parents may not be subject to the same mainstreaming requirements as a school board. . . .
>
> Subject to the foregoing exceptions, the same considerations and criteria that apply in determining whether [a] School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement. Ultimately, the issue turns on whether a placement—public or private—is reasonably calculated to enable the child to receive educational benefits.

*Id.* (internal quotation marks and citation omitted).

When it is determined that the IEP offered was deficient, and that the parents' unilateral placement was appropriate, the "district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *see also Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 16 (1993); *Frank G.*, 459 F.3d at 363-64.

**IV.        Application of Law to Facts: The PICA Problem**

The court remands this proceeding to the SRO for clarification and additional factfinding, if necessary, as to how the Kennedy School could and would have addressed T.L.'s disabilities. In particular, further analysis is required for how the proposed public school placement would have provided an educational environment that ensured T.L.'s severe PICA disorder did not

interfere with her classroom instruction.  The administrative record is deficient in its analysis of this critical issue.

PICA is a neurological and eating disorder, the essential feature of which is "the eating of one or more nonnutritive substances on a persistent basis for a period of at least 1 month."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*  ("*DSM-IV-TR*") 103 (4th ed. Text Rev. 2000).  *See* IHO Opinion at 16; SRO Opinion at 8.  The substances ingested are inedible and vary based on the age of the child.  *See id.*  Infants and younger children may eat paint, plaster, hair, or cloth; older children may consume animal droppings, insects, or pebbles; and adolescents and adults clay or soil.  *Id.*  Since the objects are inedible, they can be hazardous and lead to serious medical complications, such as lead poisoning if paint or plaster is ingested. *See id.* at 103-104; U.S. Nat'l Library of Med., Nat'l Instit. of Health, *Pica*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/001538.htm (last updated Feb. 11, 2012).

"Epidemiological data on Pica are limited."  *DSM-IV-TR* at 104.  It is more prevalent among young children than adults.  U.S. Nat'l Library of Med., Nat'l Inst. of Health, *Pica*, MedlinePlus.  In some cases it is only discovered after medical complications arise from the consumption of inedible items.  *See DSM-IV-TR* at 103-104.  The disorder often disappears or at least remits after several months in childhood.  *See DSM-IV-TR* at 104.  It may, however, persist into adolescence, or, less frequently, into adult life.  *See id.*; U.S. Nat'l Library of Med., Nat'l Inst. of Health, *Pica*, MedlinePlus.

PICA is often associated with mental disabilities and pervasive developmental disorders. *DSM-IV-TR* at 104.  "[T]he prevalence of the disorder appears to increase with the severity of the [mental disability]."  *DSM-IV-TR* at 104.  PICA "has been reported to be as high as 15% in

adults with Severe Mental [Disabilities]." *Id.*  When a child has such a developmental disorder, it is more common for PICA to continue into adolescence or adulthood.  *See* U.S. Nat'l Library of Med., Nat'l Inst. of Health, *Pica*, MedlinePlus.  If PICA occurs "exclusively during the course of another mental disorder… it is sufficiently severe to warrant independent clinical attention." *DSM-IV-TR* at 105.

T.L.'s PICA is serious.  It has persisted into her adolescent years.  It has had a significant impact on her education and her ability to benefit from classroom instruction, including when she was last in the public school system in the 2009-2010 school year.  *See, e.g.*, T.L. Performance Report from P.S. 177, IHO Parents' Exhibit I, at 5 ("T.L. cannot hope to meet her academic or functional potential in the classroom until her behavior P.I.C.A. needs are extinguished….[T.L.]'s behavior continues to be a barrier in reaching her full academic and or functional potential.").  T.L. "requires a lot of oral input to stay regulated." *Id.* at 4.  "[S]he often use[s] her mouth to explore her surroundings, especially seeking out paper and plastic objects." May 24, 2011 IEP, IHO Parents' Exhibit D, at 5.  *See* Aug. 13, 2009 Psychological Evaluation, Quality Services for the Autism Community, IHO Parents' Exhibit K, at 1, Feb. 20, 2013, ECF No. 27 ("[T.L.] also demonstrated PICA behavior and would attempt to eat items from the office floor while obsessively picking up small bits of paper that had fallen from the examiner's desk.").

Any successful educational program for T.L. must effectively address and manage her PICA disorder.  The defendant's 2011 IEP for the student recommends: "The classroom environment should be organized in [a] manner that is not over stimulating, clean and clear and not have a lot of objects she can put in her mouth."  IHO Parents' Exhibit D, at 19.

Shortly after the defendant's proposed the Kennedy School for T.L.'s placement, the parents expressed their concerns that because of its physical conditions, the school would be unable to address her PICA needs in the manner her education required. *See generally* IHO Parents' Exhibit G. According to the parents, the Kennedy School's classroom contained too much oral stimuli for their daughter. *See id.* at 1. They concluded that "[t]he classroom would not be safe for [T.L.] as she has Pica and there would be objects that she could reach on shelves, on desks and on the floor and place in her mouth." *Id. See* Tr. 12:24-13:15, 19, 26-29. They also observed that the Kennedy School would be "overly stimulating" for T.L. because of its large size and the fact that it accommodated up to 100 students in the lunchroom. *See* IHO Parents' Exhibit G, at 1.

Despite the known severity of T.L.'s PICA and her parents' continuing concerns about the Kennedy School's ability to address it, the administrative record is unacceptably sparse in details about how the public school would provide a supportive educational environment. Both decisions at the state level fail to adequately assess the nature of T.L.'s PICA condition and the kind of educational program it requires. The IHO opinion, however, does identify a number of issues about the Kennedy School facility that are of concern given T.L.'s PICA. In concluding that the recommended public school classroom was contrary to the needs and requirements of the IEP, it found the school to be overstimulating for T.L. and anxiety-producing. *See* IHO Opinion at 15. It attributed this fact to, among other things: the typicality of the large public school building, hallways, and classrooms; the presence of shelves, desks, and chairs in the class; and the very large cafeteria. *See id.* Of particular concern for T.L.'s PICA treatment is the IHO's finding that the building had wide hallways and paper hanging on either side of the walls. *Id.*

Absent from the SRO decision is any analysis of the concerns raised by the IHO as well as by the parents regarding the school's building and classroom facilities and their effect on T.L.'s PICA. Although stating that the Kennedy School provided a "supportive and structured environment" and was not "too large and overly simulating," the decision does not provide supporting evidence for that conclusion. *See* SRO Opinion at 12. For example, the reviewing officer found that the classroom was organized "in such a fashion so that there was nothing around." *Id.* at 14. But that does not address, and in fact appears inconsistent with, the parents' and hearing officer's concerns about the paper hanging in the school's hallways and the objects on shelves and desks in the classroom that T.L. could place in her mouth. *See e.g.*, Tr. 26-32, 41.

Aside from noting the caution that would be exercised by the Kennedy School faculty in educating students with PICA needs, and the fact that items in the classroom were locked away, the SRO decision does not provide more detail about the school and class physical environment. Instead it discusses the educational techniques faculty members employ in teaching students with PICA needs, including adjusting classroom instruction based on the IEP, communicating with other staff, collaborating with parents and related service providers, and providing adequate adult support in the lunchroom. *See id.* at 12-14. The public school staff is assumed to be highly skilled. Their experience and expertise in addressing a student's PICA needs is not questioned. But in light of T.L.'s PICA, evaluating only the educational methods *within* a given school environment without considering physical features is not sufficient to determine an appropriate placement. As the IEP recognizes, the physical environment itself must be suitable for the child. *See* IHO Parents' Exhibit D.

27

V.      **Power to Remand**

A court may remand a proceeding when it needs further clarification or does not have

sufficient guidance from the administrative agencies.  *See e.g.*, *New York City Dept. of Educ. v.*

*V.S.*, No. 10-CV-05120 (JG)(JO), 2011 WL 3273922, at *11 (E.D.N.Y. Jul. 29, 2011) ("I may

remand for clarification or correction....[A] district court *may* remand to an SRO, and that

remand is appropriate where the district court has received insufficient guidance from state

administrative agencies as to the merits of a case.") (citing cases); *J.F. v. New York City Dept. of*

*Educ.*, No. 12 Civ. 2184(KBF), 2012 WL 5984915, at *10 (S.D.N.Y. Nov. 27, 2012) ("[T]he

adequacy of [the student's] proposed classroom placement...is a question this Court is ill-

equipped to decide in the first instance.  As neither the IHO nor the SRO has reached that issue,

this Court remands that question to the IHO.").

Remand is appropriate to obtain the necessary educational expertise of the IHO and the

SRO.  *See D.N. v. New York City Dept. of Educ.*,  No. 11 Civ. 9223(NRB), 2012 WL 6101918, at

*5 (S.D.N.Y. Dec. 10, 2012) (remanding case to the SRO because it is "uniquely well suited to

review the content and implementation of the student's IEP" as well as the claims concerning the

"[defendant's] accommodation of the student's sensory needs") (internal citation omitted); *J.F.*,

2012 WL 5984915, at *10 (remanding to the IHO as to the adequacy of the student's proposed

public school classroom placement because the issue "involves important questions of

educational policy and requires educational expertise to resolve.").  *See also F.B. v. New York*

*City Dept. of Educ.*, No. 12 Civ. 1669(PAE), 2013 WL 592664, at *15 (S.D.N.Y. Feb. 14, 2013)

("The Court is ill-equipped to address these claims [regarding the substantive adequacy of the

student's IEP and the Department of Education's recommended school placement] in the first

instance.  The Court instead remands them to the SRO to consider, based on the voluminous record created during the administrative process.").

A district court may remand the proceeding for further development and clarification of the record.  *See e.g.*, *Carlisle Area School v. Scott P.*, 62 F.3d 520, 525-26 (3rd Cir. 1995) (approving remand by district court to administrative appeals panel for further clarification of decision so as not to impair the court's ability to fully and fairly review the decision).  *See also D.N.*, 2012 WL 6101918, at *5 (finding that parent's un-appealed claims about the student's IEP and defendant's accommodation of his sensory needs were properly before the district court, but had to be remanded because the SRO is "uniquely well suited" to review these issues on the merits).

The implementation of T.L.'s IEP at the Kennedy School, and the effect of the school's facilities and environment on her PICA needs, raise important questions of educational policy and practice that the administrative agencies are particularly well suited to resolve.  Further inquiry at the state level is not limited to the effect of the school facilities in treating T.L.'s PICA.  Remand by the SRO to the IHO or other action at the state level is not precluded.

**VI.    Conclusion**

The motions for summary judgment are denied.  The proceeding is remanded to the SRO for additional findings consistent with this opinion.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   April 12, 2013
        Brooklyn, New York

Appendix A, No. 12-CV-4483

## APPENDIX A: GLOSSARY OF ACRONYMS
## T.L. ET AL. v. THE NEW YORK CITY DEPARTMENT OF EDUCATION
## NO. 12-CV-4483

- BIP: Behavior Intervention Plan.  *See* 20 U.S.C. § 1414(d)(3)(B)(i); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(3)(i).

- CBST: Central Based Support Team

- CSE: Committee on Special Education.  *See* N.Y. Educ. Law § 4402(1)(b)(1).

- FAPE: Free Appropriate Public Education.  *See* 20 U.S.C. § 1401(9).  (This acronym was used extensively in the briefs and at oral argument, but it is not used in the court's memorandum, order, and judgment.)

- ICT: Integrated Co-Teaching.  *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(g).

- IDEA: The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*

- IEP: Individualized Education Program.  *See* 20 U.S.C. § 1414(d).

- IHO: Impartial Hearing Officer.  *See* 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1).

- SRO: State Review Officer.  *See* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2).

Appendix B, No. 12-CV-4483

### APPENDIX B: NOTES OF COURT FROM SITE VISIT, MARCH 18, 2013
### T.L. ET AL. v. THE NEW YORK CITY DEPARTMENT OF EDUCATION
### NO. 12-CV-4483

*Rebecca School (see filed and docketed Court Ex. 1, Mar. 18, 2013 (materials describing school)):*

- **Address:** 40 East 30th Street, New York, NY

- **Founders:** Tina McCourt and Michael Koffler

- **Owner:** Mike Met Schools Corp.

- **Director:** The school director is Tina McCourt. She has a Masters in Social Work from Yeshiva University and a Masters in Education from Baruch College.

- **Building:** The school has five floors accessed by elevators, sixteen classrooms, and occupies 40,000 square feet. It was founded seven years ago. The school occupies floors 1, 5, 6, & 7, and includes a rooftop gym. The building has a relatively small footprint with adequate but relatively short and narrow corridors and rooms. Floors 3 and 4 are occupied by the Aaron School, also a school for children with special needs.

- **Education and Staffing:** The School has 119 children and 120 staff members, a 1:1 ratio. Staff members include occupational therapists, physical therapists, music therapists, and psychologists. All teachers have or are pursuing Masters Degrees in Special Education. The education model is based on the teachings of Dr. Stanley Greenspan, known as the Developmental Individual Difference Relationship-based (DIR) model. This methodology is based on the core belief that relationships with people are the foundation of learning. Academics are centered on a child's ability to relate, communicate, and think.

Appendix B, No. 12-CV-4483

- **Age Range:** Students at the school range in age from 4 through 21 years old. Currently the oldest student is nineteen.

- **School day:** 8:30 a.m. to 3 p.m.

- **Sensory Gym:** This is a gym that includes proprioceptive equipment, nets, swings, and padding for different sensory systems. T.L. uses the gym and equipment through the day. The systems emphasize physical perception, balance and relationship of the student to surroundings. The school has another gym for occupational therapy. There is a rooftop gym and a rock climbing wall.

- **Classroom visited:** T.L.'s classroom was for five students, with a 5:1:2 ratio of students:teacher:paraprofessionals. The classroom had four students on the day of the visit, two teachers and two paraprofessionals.

- **Quiet room:** This is a small room, of approximately sixty-four square feet with only a floor mat, to be occupied by one student and one staff member. T.L. uses the quiet room periodically throughout the day. She often walks the stairs and corridors. When she was accidentally observed wandering in the corridors, she acted as if she was oblivious of her parents and others. She was accompanied by her personal paraprofessional.

- **Meals:** Students eat lunch in small groups in the classroom—there is no cafeteria. They bring lunches. No hot food is provided.

- **Parents:** The school maintains close contact with parents.

Appendix B, No. 12-CV-4483

## *PS 721 J.F. Kennedy School (see filed and docketed Court Ex. 2, Mar. 18, 2013 (materials describing school))):*

- **Address:** 57-12 94th Street (Elmhurst, Queens)

- **Size:** The school has 350 students and 249 staff members. It occupies three floors, and has wide and long corridors and a footprint of a square block. The rooms are large and bright, decorated with drawings, notes, schedules and other hanging materials, and with papers on desks and tables.

- **Principal:** The school principal is Beth Rudolph. She has Masters and PhD degrees in educational psychology from Brooklyn College. She has worked for thirty-four years in the public school system, rising from teacher to assistant principal to principal. She has been principal of the Kennedy School for five years.

- **Age Range:** It is a high school for autistic and mentally challenged students ranging in age from 14 to 21 years old.

- **Building:** The building is fifteen years old and in good physical condition. Along with the classrooms, it is designed for children with special needs. The school started as an occupational training center and was re-named for John F. Kennedy, Jr.

- **Education:** All students are trained in pre-vocational skills and leave by age 21. Class ratios vary and include12:1:1 ; 8:1:1; or 6:1:1, students:teacher:paraprofessionals. Plaintiff would have been placed in a 6:1:1 large classroom.

- **School day:** Students arrive between 7:45 and 8:30 a.m. They depart by 2:50 p.m.

- **Facilities:** The school has a sensory gym and quiet room, as well as physical and speech therapy rooms. It also has a large outdoor play area at ground level.

Appendix B, No. 12-CV-4483

- **Staffing:** Most teachers are trained in special education, usually with a masters and special education license, or regular teaching license with specialization in special education. The school has two nurses on staff.

- **Classroom visited:** Visited by the court was a 6:1:1 classroom with six desks. Students sit individually or together depending on their circumstance. The desk size varies by student's age and disability. The classroom has lockers for belongings and a substantial amount of papers and pictures on walls and desks. The class schedule is based on student needs.

- **Quiet room:** It contains a mat only and is equivalent to that at the Rebecca School. A student is there for a short period of time with a staff member.

- **Sensory gym:** Each piece of equipment has a specific purpose to assist the student with focus, function, and all five senses, and an effective proprioceptive sense. The goal is to provide input for students in an organized and focused way to allow for their participation. The equipment includes a swing and rolling pin, which help calm students. The gym also has attached a quiet room, which has bean bags, a medicine ball, and padding. Students are trained for pre-vocational tasks, including food preparation.

- The school has a second regular gym. Equipment is stored when not required.

- **PICA:** The school has students with PICA. It utilizes the quiet room for these students. According to staff, it prepares the gym and classroom for students in a way that is designed to address and respond to their PICA needs. Teachers say they are vigilant with students who have a PICA disorder, with materials stored in a locker and kept away from the children. There is said to be close supervision by paraprofessionals.

- **Physical Therapy Room:** This room contains bikes and balls.

4

Appendix B, No. 12-CV-4483

- **Interaction with parents:** The school holds two conferences per year with parents and monitors student progress on a monthly basis.

- **Meals and Lunchroom:** Children can eat hot breakfasts and lunches, cooked at school. Or they can bring their own meals. There are two lunch sessions and one breakfast session in the very large cafeteria. Most children are provided with free lunch. Everyone is served breakfast. Lunch services are based on family income. Students from the 6:1:1 classrooms sit in a separate area of the lunchroom.

### *Both Schools:*

### Materials on walls and desks:

- The Rebecca rooms are relatively free of materials a child can grasp and put in her mouth. There is also a minimum of papers and other materials a child could mouth on tables and floors.

- By contrast, the Kennedy School had many notices, drawings, and stickers on the room and corridor walls. None of the rooms or walls were as free of such material as were those in the Rebecca School.

### Faculty and Staff:

- Personnel in both schools appeared remarkably devoted to the care and education of their children.

### Architecture:

- Nothing in the case raises the question of appropriate or beneficent architecture in the treatment of plaintiff. The court observed but did not consider the less intimate quality of the public school as compared to the Rebecca School.